J-S83027-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF K.J.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: B.M.H.M., NATURAL MOTHER | |
| | No. 864 WDA 2016 |

Appeal from the Decree May 18, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 102 of 2015

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: S.M.W.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: B.M.H.M., NATURAL MOTHER | |
| | No. 865 WDA 2016 |

Appeal from the Decree May 18, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 102A of 2015

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF: S.D.I.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |

APPEAL OF: B.M.H.M., NATURAL
MOTHER

No. 866 WDA 2016

Appeal from the Decree May 18, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 102B of 2015

IN THE MATTER OF THE ADOPTION OF: | IN THE SUPERIOR COURT OF
W.M., JR., | PENNSYLVANIA

Appellee

APPEAL OF: B.M.H.M., NATURAL
MOTHER

No. 867 WDA 2016

Appeal from the Decree May 18, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 102C of 2015

IN THE MATTER OF THE ADOPTION OF | IN THE SUPERIOR COURT OF
S.H.I.M., | PENNSYLVANIA

Appellee

APPEAL OF: B.M.H.M., NATURAL
MOTHER

No. 868 WDA 2016

- 2 -

Appeal from the Decree May 18, 2016
In the Court of Common Pleas of Erie County
Orphans' Court at No(s): No. 102D of 2015

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, and STRASSBURGER,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED DECEMBER 5, 2016**

B.M.H.M., ("Mother") appeals from the decrees entered on May 18, 2016, granting the petitions filed by Erie County Office of Children, Youth and Families ("OCY"), or ("Agency"), involuntarily terminating her parental rights to her five minor children:  K.J.M., born in January of 2003; S.M.W.M., born in September of 2005; S.D.I.M., born in August of 2008; W.M., Jr. born in July of 2009; and S.H.I.M., born in January of 2011 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  We affirm.

In its Pa.R.A.P. 1925(a) opinion, the trial court set forth the factual background and procedural history of this appeal which we adopt herein. Trial Court Opinion, 7/28/16, at 1-14.  On December 16, 2015, OCY filed petitions for involuntary termination of Mother's parental rights to the Children.  The trial court held hearings on the petitions on April 26, 2016,

_____

[*]  Retired Senior Judge assigned to the Superior Court.

[1]  On that same date, the trial court entered decrees terminating the parental rights of W.M., Sr., the natural father, to the Children.  Father has not filed an appeal, nor is he a party to the instant appeal.

and May 17, 2016. At the hearing on April 26, 2016, OCY presented the expert testimony of Peter von Korff, Ph.D., a licensed clinical psychologist who performed psychological evaluations of Mother and Father in July of 2015. N.T., 4/26/16, at 12-41. OCY also presented the testimony of: Kristin Brunner, D.O., a child psychiatrist, who performed psychiatric evaluations on S.M.W.M., S.H.I.M., and W.M., Jr., *id.* at 42-73; Karen Drop, M.S., a therapist employed by the Achievement Center who was involved with the family, *id.* at 73-97; Kathy Weislogel, a therapist at Family Services who provided services to K.J.M., *id.* at 98-104; Amy Harris, the Director of student support services at the school where K.J.M. and S.M.W.M. had been enrolled for two years, *id.* at 104-110; and Kenneth Parmerter, the supervisor of OCY, who previously had been the OCY caseworker assigned to the family. *Id.* at 110-205.

At the hearing on May 17, 2016, OCY presented the testimony of Alyssa Beer, supervisor of OCY. N.T., 5/17/16, at 3. Ms. Beer previously was an intake specialist responsible for supervising Mr. Parmerter, and she was involved with the family and the Children. *Id.* at 4. Mother and Father testified on their own behalfs. *Id.* at 36-59, 65-74.

On May 18, 2016, the trial court entered the decrees granting the petitions and involuntarily terminating Mother's parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On June 15, 2016, Mother timely filed her notices of appeal, along with concise

statements of errors complained of on appeal pursuant to Pa.R.A.P.

1925(a)(2)(1) and (b). This Court, *sua sponte*, consolidated the five appeals

on July 11, 2016.

On appeal, Mother raises two issues with regard to each of the five

decrees as follows:

> 1. Whether the orphans' court committed an abuse of discretion and/or error of law when it made the finding/conclusions that the Office of Children and Youth had proven, by clear and convincing evidence, that terminating the parental rights of natural mother, B.M., would best fit the developmental, physical and emotional needs and welfare of the minor children?
>
> 2. Whether the orphans' court committed an abuse of discretion and/or error of law when it involuntarily terminated the parental rights of natural mother, B.M., when the Office of Children and Youth had failed to timely evaluate natural mother, B.M., and offer services or assistance to natural mother, B.M., that would likely remedy the conditions which led to the continued placement of the minor children?

Mother's Brief at 13.[2]

In reviewing an appeal from an order terminating parental rights, we

adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for

_____

[2] Mother has waived any challenge to the sufficiency of the evidence to support termination under section 2511(a) by her failure to include such a challenge in both her concise statement of errors complained of on appeal and the statement of questions involved in her brief on appeal. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both the concise statement of errors complained of on appeal and the Statement of Questions Involved in the brief on appeal).

termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d 567, 572 (Pa. 2011) (plurality opinion). As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). The trial court's order addressed sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to

the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).

The trial court found the following:

This court found by clear and convincing evidence that: (1) As of the date of filing of the involuntary termination petitions on December 15, 2015, the [C]hildren had been in placement for approximately twenty-two months; (2) the conditions that led to placement and return to placement of the [C]hildren continued to exist and [Mother] was unable or unwilling to consistently remedy those conditions within a reasonable period of time; (3) adequate services and assistance were provided and/or made available to [Mother] by the Agency, and continued and/or additional services were unlikely to remedy the conditions that led to placement and return to placement

- 8 -

within a reasonable period of time[5]; (5) termination of [Mother's] parental rights best serves the developmental, physical and emotional needs, and welfare of the [C]hildren; and (6) the necessity of serving the [C]hildren's needs and welfare outweighs the court's concern over severing the bond between [Mother] and the [C]hildren.

> [5] As noted hereafter, the time in placement of the two older children is arguably less than twelve months if twelve **consecutive** months of placement are required by 23 Pa.C.S.A. § 2511(a)(8). The court was unable to find caselaw guidance on this point. Accordingly, out of caution, likelihood of benefit from new or additional services in a reasonable period of time was considered before entering the termination decrees for purposes of 23 Pa.C.S.A. § 2511(a)(5).

Trial Court Opinion, 7/28/16, at 4 (emphasis in original).

In her first issue, Mother argues that the trial court committed an abuse of discretion and/or error of law when it made findings and conclusions that OCY had proven, by clear and convincing evidence, that terminating her parental rights would best fit the developmental, physical, and emotional needs and welfare of the Children. Mother's Brief at 24. Mother states that there was little testimony presented regarding the bond between her and the Children and that there was no testimony provided as to the Children's circumstances in their current placements that would support the trial court's finding. *Id.* at 25.

As Mother focuses her argument on section 2511(b), we will review the trial court's determination with regard to that section. This Court has stated that the focus in terminating parental rights under section 2511(a) is

on the parent, but under section 2511(b), it is on the child. ***In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

Mother contends that OCY presented insufficient evidence to support the trial court's finding that the termination of her parental rights would best fit the developmental, physical, and emotional needs and welfare of the Children. Mother's Brief at 25-26. Mother avers that Mr. Parmerter testified that the oldest child, K.J.M., did evidence a bond with her and struggled in placement because K.J.M. was not being "lavished upon." ***Id.*** at 25 (citing N.T., 4/26/16, at 195-196). She asserts that OCY did not offer any testimony regarding the Children's bond, if any, with their pre-adoptive homes. ***Id.***

Ms. Beer testified that the parents never demonstrated an ability to safely parent the Children, and the Children's best interests would be to remain in foster care with a permanency goal of adoption. N.T., 5/17/16, at 14-15. Mr. Parmerter testified that he observed no positive bond between the younger Children and Mother such that it would be detrimental to terminate Mother's parental rights. *Id.* at 195. He also testified that K.J.M. was Mother's favorite and that Mother would lavish gifts and attention upon her. *Id.* at 196. Mr. Parmerter gave as examples Mother's purchase of a $500 cell phone for K.J.M. and her routine purchase of new clothing and $120 shoes for K.J.M., while Mother was unable to afford to pay her rent. *Id.* He stated:

> As far as whether I feel it's in her best interest to remain with her parents, I would say no. As far [as] the nature of her bond, I can't say to be honest – I can't, I don't know. Whether it's a bond that's one of genuine affection and caring, or if it's a bond because she gets all kinds of expensive stuff.

*Id.*

Based on the evidence presented at the hearings, particularly the testimony of Ms. Beer and Mr. Parmerter, it was proper for the trial court to find that the Children's needs and welfare are best served by the termination of Mother's parental rights and that no bond exists such that the Children would suffer permanent emotional harm if Mother's parental rights were terminated. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of

any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In *K.Z.S.*, this Court stated that there are some instances where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child. *Id.* at 762. Additionally, this Court instructed that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *Id.* at 763. Further, in *K.Z.S.*, this Court found that any bond with the parent was fairly attenuated because the child was separated from the parent, almost constantly, for four years. *Id.* at 764.

Moreover, our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *T.S.M.*, 71 A.3d at 267. The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *Id.*

While Mother may claim to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Further, there was no need for OCY to produce evidence regarding pre-adoptive homes for the Children, as the trial court may terminate parental rights without pre-adoptive homes being identified for the Children. *See In re Adoption of B.J.R.*, 579 A.2d 906, 915 (Pa. Super. 1990), (stating that the lack of a prospective adoptive family for a child does not serve to bar the involuntary termination of parental rights where such termination is otherwise warranted); *see also* 23 Pa.C.S. § 2512(b) ("If the petitioner [for involuntary termination] is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.")]. Thus, the competent evidence in the record supports the trial court's determination that termination of Mother's parental rights would serve the Children's best interests and that the Children would not suffer any harm from doing so. We will not disturb the trial court's decision. *In re Adoption of S.P.*, 47 A.3d at 826-827.

In her second issue, Mother contends that the trial court committed an abuse of discretion or error of law when it terminated her parental rights because OCY failed to timely evaluate Mother and offer her services or

assistance that would have likely remedied the conditions that led to the original placement. Mother asserts that, despite concerns prior to the first permanency review hearing concerning her ability to understand and internalize the issues that led to the Children's initial placement, OCY failed to recommend or request a psychological evaluation of Mother until approximately two years into the placement. Mother's Brief at 23, 31. Mother claims that OCY's failure to provide her with proper services at an earlier point prevented her from obtaining reunification with the Children. *Id.* at 31.

After careful review, we find that Mother's argument lacks merit. In *In re D.C.D.*, 105 A.3d 662 (Pa. 2014), our Supreme Court held that an agency's provision of reasonable efforts to reunite parents and children is not a prerequisite for termination of parental rights. *Id.* at 672. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")). Furthermore, evidence of OCY's reasonable efforts towards reunification was presented. Trial Court Opinion, 7/28/16, at 10-14. The timing of the psychological evaluation is not dispositive. Thus, the trial court's legal conclusions are not the result of an error of law or an abuse of discretion. *Adoption of S.P.*, 47 A.3d at 826-

827. Accordingly, we affirm the trial court decrees terminating Mother's parental rights to the Children under Section 2511(b).

Decrees affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/5/2016

IN THE MATTERS OF          :   IN THE COURT OF COMMON PLEAS
THE ADOPTIONS OF           :   OF ERIE COUNTY, PENNSYLVANIA
                           :
                           :   ORPHANS' COURT DOCKET NOS.:
K.J.M.                     :        102     of 2015
S.M.W.M.                   :        102A   of 2015
S.D.I.M.                   :        102B   of 2015
W.M., Jr.                  :        102C   of 2015
S.H.I.M.                   :        102D   of 2015

**FILED**
JUL 28 2016
Register of Wills

## 1925(a)(2) OPINION

I.    BACKGOUND

On May 17, 2016, five Decrees were entered terminating the parental rights of the natural

mother, ▮▮▮▮▮▮▮ ("Appellant"), to her five minor children[1]:

▮▮▮▮▮▮▮ ("K.J.M."), 13 years old, born 01/▮▮/03

▮▮▮▮▮▮▮ ("S.M.W.M."), 10 years old, born 09/▮▮/05

▮▮▮▮▮▮▮ ("S.D.I.M."), 7 years old, born 08/▮▮/08

▮▮▮▮▮▮▮ ("W.M., Jr."), 7 years old, born 7/▮/09

▮▮▮▮▮▮▮ ("S.H.I.M."), 5 years old, born 01/▮/11

The record reflects that the Agency met its burden of establishing grounds for termination

under 23 Pa. C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8) and (b) by clear and convincing evidence.

Accordingly, this court requests that the Superior Court affirm its Decrees.

---

[1] Decrees were entered terminating the natural father's parental rights on the same date. Those
Decrees were not appealed.

1

## II.    ISSUES PRESENTED

In her Statements of Errors Complained of on Appeal filed June 15, 2016, Appellant raises the following two issues with regard to each of the five Decrees:[2]

First, whether the court abused its discretion and/or committed error of law when it found that that the Office of Children and Youth ("Agency") proved by clear and convincing evidence that terminating Appellant's parental rights was in the best interests of the children.

Second, whether the court abused its discretion and/or committed error of law by terminating Appellant's rights when the Agency failed to timely evaluate her, and offer services or assistance that could have likely remedied the conditions which led to the continued placement of the children.

## III.    STANDARD OF REVIEW

The standard of review in termination of parental rights cases requires appellate Courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) citing In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012).* "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision should not be reversed merely because the record would support a different result. *Id.*

---

[2] The five appeals were consolidated on July 11, 2016 at Superior Court Docket Number 864 WDA 2016.

2

## IV. PROCEDURAL HISTORY

The children were placed in protective custody of the Agency by order dated October 23, 2013.[3] *IVT Trial Agency Exhibit 6.* A shelter care hearing occurred on October 29, 2013. The parties stipulated to continued shelter care pending the adjudication hearing. *IVT Trial Agency Exhibit 4 - Master's Recommendation for Shelter Care, 10/29/13, confirmed 11/6/13.*

The Agency filed its dependency petition on October 30, 2013. *IVT Trial Agency Exhibit 5.* The adjudication hearing occurred November 5th, 2013. At the adjudication hearing, the parties stipulated to the adjudication of dependency and the facts stated in the dependency petition, with the exception that reference to a broken arm was omitted from the stipulated facts by agreement of the parties. *IVT Trial, 4/26/16, pg. 113-114.*

A dispositional hearing was held on December 4, 2013, and seven permanency review hearings occurred thereafter at regular intervals, on April 30, 2014, July 23, 2014, October 25, 2014, December 10, 2014, April 1, 2015, June 10, 2015, September 21, 2015, and March 30, 2016. After the December 10, 2014 hearing, adoption was added as a concurrent goal, and services to the parents continued. *IVT Trial Agency Exhibit 6.* After the September 21, 2015 hearing, the dependency goal was changed to adoption, and services to the parents were terminated. *Id.*

Petitions for involuntary termination of parental rights were filed by the Agency with regard to all five children on December 16, 2015. Hearings on the petitions occurred before this

---

[3] Unless specifically stated otherwise, references herein to duplicate pleadings, orders and other evidence pertaining uniformly to each of the children are in the singular.

3

court on April 26, 2016 and May 17, 2016. This court granted the Agency's petitions by Decrees dated May 17, 2016, and Mother filed her timely appeals on June 15, 2016.[4]

## V.    SUMMARY OF OPINION

This court found by clear and convincing evidence that: (1) As of the date of filing of the involuntary termination petitions on December 15, 2015, the children had been in placement for approximately twenty-two months; (2) the conditions that led to placement and return to placement of the children continued to exist and Appellant was unable or unwilling to consistently remedy those conditions within a reasonable period of time; (3) adequate services and assistance were provided and/or made available to the Appellant by the Agency, and continued and/or additional services were unlikely to remedy the conditions that led to placement and return to placement within a reasonable period of time[5]; (5) termination of Appellant's parental rights best serves the developmental, physical and emotional needs, and welfare of the children; and (6) the necessity of serving the children's needs and welfare outweighs the court's concern over severing the bond between Appellant and the children.

---

[4] This opinion was due per Pennsylvania Fast Track Appeal Rules by July 15, 2016. Due to delay in receiving hearing transcripts, this court requested an extension for filing its opinion until July 29, 2016. *See letter from this court to the Superior Court Prothonotary dated July 6, 2016.*

[5] As noted hereafter, the time in placement of the two older children is arguably less than twelve months if twelve consecutive months of placement are required by 23 Pa.C.S.A. §2511(a)(8). The court was unable to find caselaw guidance on this point. Accordingly, out of caution, likelihood of benefit from new or additional services in a reasonable period of time was considered before entering the termination decrees for purposes of 23 Pa.C.S.A. §2511(a)(5).

4

## VI.    DISCUSSION

### A.    Time in Placement

As of the date of filing of the involuntary termination petitions on December 15, 2015, K.J.M. had been placed away from Appellant for approximately eighteen out of twenty-five months, over two periods of time. The first was from the original date of placement, October 23, 2013, until July 16, 2014, when a reunification attempt was initiated. That attempt failed after approximately ten months. The child was removed from Appellant and father again on May 27, 2015. *IVT Trial Agency Exhibit 6.*

As of the date of filing of the involuntary termination petitions on December 15, 2015, S.M.W.M. had been placed away from Appellant for approximately nineteen out of twenty-five months, over two periods of time. The first was from the original date of placement, October 23, 2013, until August 22, 2014, when a reunification attempt was initiated. That attempt failed after approximately nine months. The child was removed from Appellant and father again on May 27, 2015. *Id.*

The three younger children, S.D.I.M., W.M., Jr., and S.H.I.M, were in placement away from Appellant for the entire twenty-five months from date of original placement to date of filing of the involuntary termination petition. *Id.*

### B.    Conditions Leading to Placement / Failure to Remedy

At the adjudication hearing on November 5th, 2013, the parties stipulated that the children were without proper parental care or control for the reasons set forth in the dependency petitions for each child, including Appellant's history with the Agency involving another of her children who was adjudicated dependent, and with regard to whom she was indicated at the perpetrator of

5

physical abuse;[6] concerns about home conditions, discipline methods, and the parents' mental health; concerns about physical abuse in the home due to unexplained injuries such as black eyes and burns, about which the children were reluctant to provide information; failure to seek necessary medical attention; and truancy concerns pertaining to the school age children. *IVT Trial, 4/26/16, pg. 113-114; Agency Exhibit 5.* Shortly after placement, additional related concerns were identified including extensive, unexplained scarring over S.D.I.M.'s body, *IVT Trial, 4/26/16, pg. 192-193*; academic deficiencies of the school age children, *IVT Trial Agency Exhibit 14*; significant developmental delays in S.D.I.M. and S.H.I.M., *Id.; IVT Trial, 4/26/16, pg. 49-50, 193*; behavioral and mental health issues with regard to all of the children, *IVT Trial, 4/26/16, pg. 120-121; IVT Trial Agency Exhibit 14*; and revelation of circumstances of extreme lack of responsible parental supervision, *IVT Trial, 4/26/16, pg. 113-114; IVT Trial Agency Exhibit 14.* Parental deficiencies waxed and waned throughout the dependency proceedings, but ultimately did not materially improve.

The dependency proceedings relative to this case were preceded by a history of Agency involvement with the family. *IVT Trial Agency Exhibit 14.* Alyssa Beer, a Supervisor at the Agency, testified that she became involved with the family in July of 2013, and was instrumental in removing the children from Appellant's and father's care. *IVT Trial, 5/17/16, pg. 4.* On October 22, 2013, Ms. Beer discovered a burn to W.M., Jr.'s face, depicted in photographs taken by her and admitted as IVT Trial Agency Exhibit 20. This was not the first burn suffered by the child. About a month earlier, W.M., Jr. sustained a burn to his chest while playing unsupervised. His sister knocked over an unshaded lamp that landed on W.M., Jr. *IVT Trial, 5/17/16, pg. 7.* The chest burn was discovered by the Agency on an unannounced visit by Ms. Beer on October

---

[6] Appellant's parental rights to D.H. were ultimately terminated by Decree dated June 19, 2015. *IVT Trial Agency Exhibit 15.*

6

7, 2013. At that time, Appellant reported that the burn had occurred approximately 10 days prior, and was "no big deal." *IVT Trial, 5/17/16, pg. 8, 24.* Appellant told Ms. Beer that she took the child to his primary care physician shortly after the incident, and that further medical care was not necessary. *Id.* Ms. Beer did not agree, but refrained from pursuing further medical care until she could document the primary care visit. *Id.* However, Ms. Beer found that none of the care physicians identified by Appellant had a record of a burn related visit or treatment. *IVT Trial, 5/17/16, pg. 25.*

At trial, Appellant testified that the chest burn occurred on September 28th, 2013 when the children were running around the house unsupervised, and one child tipped an unshaded lamp onto W.M., Jr. *IVT Trial, 5/17/16, pg. 41.* The facial burn occurred a few weeks later, on or about October 22, 2013, when a hot pot was left unattended, in reach of the child. *IVT Trial, 5/17/16, pg. 64.*

The facial burn was observed by Mr. Beer on her visit to the home on October 22, 2013. Ms. Beer testified that Appellant was again hedging on taking W.M., Jr. for medical treatment for the new burn, and that was essentially the tipping point. Ms. Beer took the child to the hospital herself, accompanied by Appellant, and the same day all of the children were removed from the parents' care. *IVT Trial, 5/17/16, pg. 4, 8-9.*

Appellant's testimony recounting both burns is troubling for several reasons. First, regarding the chest burn, Appellant attempted to minimize her lack of care by reporting that the father was watching the children while she was taking a bath, though he happened to be in the basement doing laundry at the time of the injury. *Id.* However, father testified that he was at work when the chest burn occurred. *IVT Trial, 5/17/16, pg. 68.* Father's testimony that he was at work was spontaneous and credible. Appellant's testimony was reluctant, with an air of

7

untruthfulness. It was apparent that Appellant still had not accepted responsibility for her serious lapse in judgment in leaving very young children alone while she took a bath.

Second, concerning the facial burn, Appellant testified that the burn occurred when one of the children bumped a hot pot into W.M., Jr.'s face. *IVT Trial, 5/17/16, pg. 64.* She minimized this event and essentially blamed it on the children for "sneaking" into the kitchen through a closed gate. *Id.* Appellant never acknowledged that she should have placed the hot pot out of reach of the children, nor did she show remorse for not keeping a better eye on her children. Further, upon questioning by the court, she revealed that the accident happened at 12:00 a.m., so at least two young children were up and unsupervised at that late hour. *IVT Trial, 5/17/16, pg. 64.* Again, Appellant's defensive testimony and lack of appreciation for her responsibility for the welfare of her children demonstrates that she continues to be in denial with regard to how her poor parental judgment can lead to serious injury to her children. [7]

Another concern is lack of medical treatment for both burns, and Appellant's untruthful testimony on the subject. Despite diligent efforts by the Agency to document that mother sought appropriate medical treatment for W.M., Jr.'s chest burn, there is no evidence of treatment. She told the Agency that she took the child to the family doctor, but Ms. Beer determined that the doctors' office had no record of seeing or treating W.M., Jr. for the injury. *IVT Trial, 5/17/16, pg. 24-25.* Also, in her direct testimony, she stated with some prompting that she took the boy to a hospital for treatment, and was given burn cream. *IVT Trial, 5/17/16, pg. 39-40.* Yet on cross-examination, when asked a leading question regarding whether she took the child to the primary care physician, Appellant again asserted that she did so. *IVT Trial, 5/17/16, pg. 51.* There is no acceptable explanation for Appellant's conflicting testimony. Surely, had she taken the boy to

---

[7] The court further notes that with regard to the unshaded lamp that caused W.M., Jr.'s chest burn, the same lamp was moved to Appellant's new home several months later, and remained within reach and unshaded. *IVT Trial, 5/17/16, pg. 13.*

8

the hospital, she would have volunteered that information to the Agency caseworker right away, since allegations of lack of medical treatment were a known, primary issue at the time of placement. *See IVT Trial, 5/17/16, pg. 24-25.*

With regard to the facial burn, she admits that she did not seek medical care because of the late hour. *IVT Trial, 5/17/16, pg. 59-60, 64.* She testified that she was going to take him to the hospital in the morning, but the caseworker appeared and took him instead. *Id.* However, the caseworker testified that Appellant was avoiding taking the child for treatment, so she took him herself, accompanied by Appellant. *IVT Trial, 5/17/16, pg. 27-28.* In light of Appellant's failure to seek prompt attention for the chest burn, there is no reason to believe that W.M., Jr. would have received appropriate medical care for the facial burn had the caseworker not appeared.[8]

Appellant's counsel attempted to argue at trial that W.M., Jr.'s burns were a thing of the past, now healed and no longer relevant. The court disagrees. To the contrary, Appellant's testimony revealed that she takes no responsibility whatsoever for the traumatic injuries sustained by her son, and so is unlikely to alter her behavior in the future to provide proper parental care and control over her children. This conclusion is bolstered by her ongoing "passive-aggressive" behavior throughout the period of placement, as described by the caseworkers and discussed below, in mismanaging the scheduling of services and missing medical appointments, which in one instance left her daughter S,M.W.M., without necessary medication, resulted in delayed services and progress with the permanency plan, and ultimately resulted in the closure of family based counseling services.

---

[8] The court also notes that Appellant could not identify a dentist for any of the children. S.D.I.M. required oral reconstructive surgery after placement due to extensive tooth decay and malalignment. *IVT Trial Agency Exhibit 14; IVT Trial, 4/26/16, pg. 122.*

After the children were placed in protective custody, additional injuries were discovered, including cuts and scars. *IVT Trial, 5/17/16, pg. 9.* Appellant offered fairly ordinary explanations for some injuries, but could not explain others. *IVT Trial, 5/17/16, pg. 10.*

Mr. Kenneth Parmerter, the Agency caseworker assigned to the family prior to the dispositional hearing, provided additional testimony about events occurring before and after placement. *IVT Trial, 4/26/16, pg. 111; IVT Trial Agency Exhibit 14.* Mr. Parmerter testified that Appellant was an indicated perpetrator of abuse with regard to another of her children who is not a subject of these proceedings. *IVT Trial, 4/26/16, pg. 112; IVT Trial Agency Exhibits 5, 14, 15.* This history led to heightened concern for the five children at issue when unexplained or inadequately explained injuries were discovered.

On questioning the children about their injuries, they told Ms. Beer that they play a game called "momma's whoopings", where the children enter a dark room carrying various implements and beat on each other until the last one standing, deemed "mom", is declared the winner. *IVT Trial, 5/17/16, pg. 9-10.*[9]

At the dispositional hearing on December 4, 2013, Mr. Parmerter recommended services for Appellant including random urinalysis, parenting classes, family counseling, and ongoing mental health treatment. He also requested that Appellant be required to participate in these services and demonstrate an ability to apply what she learned, and that she be required to schedule and attend all necessary medical and dental appointments. *IVT Trial, 4/26/16, pg. 116.*

---

[9] Further, S.D.I.M. disclosed, and K.M. admitted, that at least some of S.D.I.M.'s scars were the result of discipline administered by K.M. *IVT Trial Agency Exhibit 14 – Court Summary, 12/4/13, pg. 10).* IVT Trial Agency Exhibit 14 (Court Summaries from the permanency review hearings) was entered into evidence at the IVT trial with the exception of hearsay content. S.D.I.M.'s and K.M.'s statements are hearsay. However, the court considered the evidence as relevant to the children's states of mind, in that they saw themselves as living in an environment where serious, scar-rendering abuse by one sister against another, could occur, regardless of whether it in fact happened.

10

Mr. Parmerter did not pursue requesting an order for a higher level of services in the form of a blended case manager because, though he thought it would be helpful, the parents insisted they did not need that level of service. *IVT Trial, 4/26/16, pg. 118.*

Through the first review period, from December 4, 2013 to April 30, 2014, Mr. Parmerter successfully implemented services for the children, and had some success with the parents' services. The parents participated in urine screens and parenting classes, but there was limited participation by the parents in children's services. *IVT Trial, 4/26/16, pg. 118-120.*

The parents' visitations with the children were also problematic. By the review hearing on in April of 2014, he was recommending a goal change to include a concurrent goal of adoption. When asked why, Mr. Parmerter explained: "Just as I previously stated , the parents were only moderately compliant with part of what we were asking. The visits had not really progressed that well, there were still -- like I said , the visitations were extremely chaotic, the children were out of control. And there just was not a lot of progress being made in the case." pg. 123. In response to questioning about the timing of the requested goal change being relatively early in the case, Mr. Parmerter explained that his decision was influenced by the family's history with the Agency, as well as discovery that the family had been under investigation in Cincinnati, Ohio when they abruptly left that jurisdiction to return to Erie, Pennsylvania in early 2013. *IVT Trial, 4/26/16, pg. 123-125.* Nevertheless, the court elected not to adopt Mr. Parmerter's goal change recommendation, and services continued relatively unchanged through the next review period. The court also directed the Agency pursue blended case manager services due to concern that Appellant and father did not understand the gravity of their situation. *IVT Trial, 4/26/16, pg. 125.*

Mr. Parmerter testified that during the period between the April, 2014 review hearing, and the next hearing set for July, 2015, circumstances began to improve. The parents were

11

showing initiative, engaging with services, and cooperating with the Agency. *IVT Trial, 4/26/16, pg. 126.* As summarized by Ms. Beer, "... Mr. Parmerter would remark to me how proud of the parents he was, that he would go into a home visit and they would be having a meal with the kids and it would be good and the visit in the home would be good and things would be calm and the kids would be good and they'd be doing homework with them, those were during the high times." *IVT Trial, 5/17/16, pg. 32.* Because of the marked improvement, the Agency began returning the children to Appellant and father. *IVT Trial, 4/26/16, pg. 127.* The two oldest girls were returned first, a month apart, shortly before the beginning of the 2014-2015 school year. The plan was to give the parents time to adjust, and the therapists additional time to work with the three younger children, so as not to overwhelm the parents. *IVT Trial, 4/26/16, pg. 127-128.* Mr. Parmerter described this period as a "high watermark" in the case, and it lasted until reports of truancy, failure to cooperate with the service providers, and failure to follow the permanency plan began to surface in late 2014. *IVT Trial, 4/26/16, pg. 126, 131.*

By around the end of 2014, Appellant was charged with truancy, K.J.M. was acting out at school, and both girls had tardiness issues. The girls reported that they were late because they had to get themselves up and ready for school in the morning. *IVT Trial, 4/26/16, pg. 132.* S.M.W.M. also reported that K.J.M. was again in charge of discipline and had been hitting her. *Id.* Safe Harbor Behavioral Health also reported that Appellant had missed medical management appointments for S.M.W.M., which caused a lapse in the medication she needed. *Id.* Discord between Appellant and father also surfaced. Appellant alleged father was using alcohol and engaging in domestic violence. *IVT Trial, 4/26/16, pg. 132-133..* Based on testimony to this effect, the court changed the goal to include adoption as a concurrent goal, but allowed the two older girls to stay with Appellant and father on the condition of no further reports of tardiness

12

and truancy. *IVT Trial, 4/26/16, pg. 133.* Services continued relatively unchanged. *IVT Trial, 4/26/16, pg. 128, 124.*

By the time of the April, 2015, review hearing, the parents' circumstances had essentially deteriorated to the point they were, for all intents and purposes, indistinguishable from those that led to initial placement. Appellant pled guilty to truancy charges, father had been arrested for public drunkenness and disorderly conduct in or about January of 2015, and father's urine samples tested positive for illegal drugs. *IVT Trial, 4/26/16, pg. 134-136.* The court found there had been minimal compliance with the permanency plan and minimal progress toward alleviating the circumstances that led to placement. *Id.* After repeated failed drug tests by the father, the girls were again removed from the home in May of 2015. *Id.* Appellant and father continued to live together until they were evicted from their apartment for nonpayment of rent in late 2015. *IVT Trial, 5/17/16, pg. 56; IVT Trial, Agency Exhibit 22.*

By the June 2015 review conference, Mr. Parmerter advocated for a goal change to remove reunification as a goal. The court found continued minimal compliance with the permanency plan and minimal progress toward alleviating the circumstances that led to placement, but declined to change the goal to adoption. Instead, the goal remained unchanged for another review period, but the permanency review order mandated "strict compliance" with the order. *IVT Trial, 4/26/16, pg. 138.*

At the September, 2015, review hearing, the court found that circumstances had not improved, and ordered the goal changed to adoption, with no further services to the parents and no further visitation with the children. *IVT Trial, 4/26/16, pg. 139.* At the IVT trial, all of the Agency witnesses consistently and credibly agreed that by the time the IVT petition was filed, no lasting progress had been made with the Appellant and father, and there was little chance any additional or different services would make a difference.

13

For example, Karen Drop, family based therapist for the Achievement Center in Erie, testified that she had difficulty engaging Appellant and the father in family based counseling services from the very beginning. The family based therapy program is designed to work closely with challenged families to identify specific needs and develop plans to resolve the issues. The program does not work if the parents do not actively participate. Ms. Drop testified that over the eight months she attempted to work with Appellant, the parents would regularly identify goals for improvement, but then state that everything was fine. *IVT Trial, 4/26/16, pg. 76-80; IVT Trial Agency Exhibit 12.* Further, Appellant cancelled or failed to appear at sixteen sessions without explanation, four of which were medical management meetings, despite extensive efforts by Ms. Drop to develop a calendar with Appellant so that she could easily know her appointment schedule. *Id.* After repeated efforts to obtain the parents' cooperation with counseling services, Ms. Drop closed the case for failure of the parents to cooperate with services. *Id. Ms. Drop's report concludes:* "The team's continued concerns involve the family's ability to function and maintain the small amount of structure they do have without the constant intervention of service providers...". *IVT Trial Agency Exhibit 12.*

Mr. Parmerter testified that the situation with Appellant's missing counseling appointments, and scheduling conflicting appointments, became so blatant that he came to believe Appellant was intentionally attempting to avoid the family based counseling sessions, a belief he continued to hold through the time of the IVT trial. *IVT Trial, 4/26/16, pg. 167.*

Finally, Ms. Beer testified that from the time she began working with Appellant and father in 2013 to the end of services in 2015, she observed no lasting improvement of the circumstances that led to placement. Throughout this time period she never felt that the Appellant and father could safely parent the five children. *IVT Trial, 5/17/16, pg. 14.*

14

C. Additional or New Services

Consistent with Appellant's second issue on appeal, counsel for both parents attempted to make much of the fact psychological evaluations of Appellant and father were not accomplished until fairly late in the dependency proceedings, in July of 2015, and that additional services suggested by the psychologist were never implemented. The court found this line of inquiry unconvincing. The psychologist, Dr. Peter von Korff, a clinical psychologist with experience evaluating individuals involved with the Agency, did not find that either parent suffered from cognitive limitations that would have hindered their ability to participate in the services offered to date. In fact, it appears that both parents were able to complete the evaluation process with relative ease, aside from some help with reading the written parts of the evaluation. Instead, Dr. von Korff determined that both parents suffered from emotional / mental health issues that were impeding their ability to relate to and appropriately care for their children, and that intensive parent-child interactive therapy was needed to assist with repairing the parent-child relationships. *IVT Trial, 4/26/16, pg. 20; IVT Trial Agency Exhibit 11.* Given that the parents failed to comply with the family based therapy services and refused blended case manager services, there was no reason for the Agency to assess that Appellant would actively participate in parent-child interactive therapy with their five children. *See IVT Trial, 4/26/16, pg. 197.* Moreover, even if they did, common sense dictates that many months, or likely many years, of therapy would be required to improve their parenting abilities and relationships, if improvement were possible at all, and the children had already been in placement for nearly two years. Counsel for the Agency framed the Agency's conclusion accurately when he posited that either Appellant and father have cognitive limitations such that they *could not* comply with services, or they did not have cognitive limitations and *were not* complying with services. *IVT Trial, 4/26/16, pg. 200; see 23 Pa.C.S.A. § 2511(a)(5) (grounds for termination exist when parent cannot or will not remedy the*

15

*conditions that led to placement within a reasonable period of time).* Accordingly, this court found that the services offered to date were appropriate and adequate, and new or additional services were unlikely to remedy the conditions that led to placement in a reasonable period of time.

### D. Best Interests of the Children / Bonding

As discussed above, clear testimony and other evidence presented at the IVT trial convinced this court that the parents were not likely to appropriately care for any of their five children within the foreseeable future. The children need stability and responsible parental figures who can devote their full attention to supporting the special needs of these children. Mr. Parmerter aptly summarized the special needs of the children in his trial testimony recorded at pages 194 to 195 of the April 26, 2016 IVT trial transcript. There is no question that Appellant is not such a parental figure.

A proper section 23 Pa.C.S.A. § 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *In re T.D., 949 A.2d 910, 920–21 (Pa.Super. 2008).* In *In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super.2005),* the Superior Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, the Superior Court has instructed that the trial court must discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.*

Concerning the children's bond with Appellant, Mr. Parmerter testified that during his interactions with the Appellant and children over two years of placement, he did not observe a bond with between mother and the four younger children, who were ages 8, 5, 4 and 2 at the time of placement. With regard to K.J.M., the oldest child, Mr. Parmerter believes the child does

16

exhibit a bond with Appellant, and may prefer Appellant to a foster/adoptive family. However, the nature and/or quality of that bond is suspect. *IVT Trial, 4/26/16, pg. 196.*

The court concludes that regardless of the nature and extent of the bond between K.J.M. and Appellant, for the reasons discussed above, most importantly Appellant's penchant for delegating parental and disciplinary control over the younger special needs children to K.J.M., the academic and truancy issues experienced by K.J.M. and S.M.W.M. while in the mother's care,[10] and the Appellant's choice to remain living with father when she knew that his failed drug tests would result in loss of the two daughters that had been returned to her, the cost of severing the bond between mother and child is outweighed by the threat to K.J.M.'s and the other children's developmental, physical and emotional wellbeing if they were to remain with Appellant.

Like in the *In re T.D.* case, the ramifications for not terminating parental rights outweigh the additional grief the K.J.M. and possibly the other children may suffer as a result of the termination. It is well past time to give these children the opportunity for placement in a loving and stable adoptive home, where they may form new parental relationships to support them into adulthood. Accordingly, this court requests that its Decrees be affirmed.

BY THE COURT:

JOSEPH M. WALSH, III, JUDGE

---

[10] Both of the school age girls were significantly behind academically when they went into placement. *IVT Trial agency Exhibit 14.* The situation persisted when the girls returned to Appellant's care during the 2014-2015 school year. Appellant failed to enroll the children in summer school as recommended, and Mr. Parmerter testified that truancy charges were filed against Ms. Manning every year the Agency was involved. During the 2014-2015 school year, the district magistrate ordered Appellant to attend after-school sessions with the staff and children at Wiley Charter School because the children were significantly behind academically, and were not receiving adequate support at home, and Appellant and father failed to follow the magistrate's directive. *IVT Trial, 4/26/16, pg. 146.*

cc: OCY Legal Department

Court Administration-Julia Bagnoni

Catherine Allgeier, Esquire, 504 State Street, Erie, Pa    16501
(Attorney Appointed to represent the children)


Anthony Himes, Esquire, 246 West 10th Street, Erie, PA 16501
(Attorney Appointed to represent the mother)

Emily Merski, Esquire, 3820 Liberty Street, Erie, PA 16509
(Attorney Appointed to represent the father)

Bianca Monique Harris, 943 East 30th Street, 16504 (mother)

Willie Manning, 529 East 14th Street, Apt. 1, Erie, PA 16503 (father)

Melissa L. Larese, Esq.